UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X          <u>For Online Publication Only</u>
JOSEPH PETRUSIELLO,

                            Plaintiff,

                                          **<u>MEMORANDUM & ORDER</u>**

        -against-                                 18-CV-6553 (JMA)

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.
-------------------------------------------------------------------X
**APPEARANCES**

Daniel Adam Osborn
Osborn Law P.C.
43 West 43rd Street, Ste 131
New York, NY 10036
      *Attorney for Plaintiff*

Dara A. Olds
United States Attorney's Office, EDNY
271 Cadman Plaza East
Brooklyn, NY 11201
      *Attorney for Defendant*

**AZRACK, United States District Judge:**

      Plaintiff Joseph Petrusiello ("Plaintiff") seeks review of the final determination by the Commissioner of Social Security (the "Commissioner"), reached after a hearing before an administrative law judge ("ALJ"), denying Plaintiff disability insurance benefits under the Social Security Act.  The case is before the Court on the parties' cross-motions for judgment on the pleadings.  For the reasons discussed herein, Plaintiff's motion for judgment on the pleadings is **DENIED**, and the Commissioner's cross-motion is **GRANTED**.

# I. BACKGROUND

## A. Procedural History

On July 29, 2013 and July 31, 2013, Plaintiff filed an application for child's insurance benefits with the Social Security Administration ("SSA") under his parents' names, alleging disability as of January 1, 2005, due to inflammatory bowel disease.  (Tr. 63-64[1].)  Plaintiff filed an application under his own name for supplemental security income ("SSI") on January 5, 2015 and again for children's insurance benefits on May 4, 2015, alleging disability since November 1, 2008, due to inflammatory bowel disease, Crohn's disease, colitis, pancreatitis, and perianal disease.  (Tr. 81-83, 174-79, 201.)  Following denial of his claim, Plaintiff requested a hearing and appeared with his attorney for an administrative hearing before Administrative Law Judge Paul Greenberg ("ALJ Greenberg") on July 31, 2017.  (Tr. 31-62.)

In a decision dated November 17, 2017, the ALJ denied Plaintiff's claim, finding that he was not disabled.  (Tr. 15-25.)  The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work except that he "cannot work on ladders, ropes or scaffolds;" "cannot operate motorize equipment as part of a job;" and "must be able to sit for five minutes after standing for 25 minutes, or stand for five minutes after sitting for 25 minutes, but he can continue working in either position."  (Tr. 19.)  The ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (Tr. 23-24.)  ALJ Greenberg's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on September 13, 2018.  (Tr. 1-3.)  This appeal followed.

---

[1] Citations to "Tr." refer to pages of the certified administrative record filed by the Commissioner.  (ECF No. 22.)

## B. Plaintiff's Background and Testimony

Plaintiff was born in 1994.  (Tr. 39, 82.)  He completed high school in 2012.  (Tr. 202.)  On September 1, 2013, Plaintiff's mother completed a function report.  (Tr. 191-98.)  Plaintiff reported that he had had Crohn's disease and anal fissures since he was thirteen.  (Tr. 192.)  He lived in a house with family and his parents prepared his food and meals. (Tr. 191-93.)  He reported that he was in constant pain and spent his time at doctors' appointments and resting.  (Tr. 193.)  Plaintiff received Remicade[2] treatment once every six weeks from a nurse who came to his house.  (Tr. 198.)  He sat outside a few times per day.  (Tr. 193.)  He did not do chores or clean.  (Id.)  He had a driver's license and drove and rode in a car to travel.  (Id.)  Plaintiff identified no limitations in lifting, carrying, standing, walking, sitting, climbing stairs, or squatting. (Tr. 195, 197-98.)

In a later function report dated May 28, 2015, Plaintiff reported severe pain, burning in his pancreas, vomiting, and that he was weak.  (Tr. 211.)  He reported that he used the toilet for hours at a time and was in constant pain.  (Tr. 212, 214.)  His parents prepared his meals, he did not do household chores, and he rode in a car to travel.  (Tr. 213.)  Plaintiff only went out for doctors' appointments.  (Tr. 216.)  He reported that his medical conditions had gotten "severely worse" and he could not lift and could not stand or walk for a long time (Id.)

At the July 31, 2017 hearing, Plaintiff testified that he lived with his parents and siblings. (Tr. 40.)  He completed high school and he last worked in 2011.  (Tr. 43-44.)  He had to stop working because he "was going to the bathroom consistently.[3]"  (Tr. 44.)  He also received a

---

[2] Remicade "is used to treat . . . certain bowel diseases (Crohn's disease, ulcerative colitis) . . . In these conditions, the body's defense system (immune system) attacks healthy tissues. [Remicade] works by blocking the actions of a certain natural substance (tumor necrosis factor alpha) in the body. This helps to decrease swelling (inflammation) and weaken your immune system, which slows or stops the damage from the disease."  (WebMD, Remicade Vial, https://www.webmd.com/drugs/2/drug-16554/remicade-intravenous/details.)

[3] The Commissioner's brief states that Plaintiff testified that he stopped working because he "'was going to the bathroom constantly.'"  (ECF No. 20 at 2.)  The transcript of the hearing states: "I was going to the bathroom consistently."  (Tr. 44.)

certificate for a nurse's aide course.  (Tr. 55.)  Plaintiff learned that he had Crohn's disease when he was in seventh grade.  (Tr. 45.)  He has had approximately eight surgeries on his rectum.  (Tr. 45.)  He testified that a once every eight weeks, a nurse came to his house to administer intravenous Remicade treatment for his Crohn's disease.  (Tr. 45-46.)  The treatment lasted for three hours.  (Id.)  He had been receiving Remicade treatment for eight or nine years, but it was "not working as much as it used to," because "[he's] so immune to it."  (Tr. 46.)  He reported that he was also taking the medications Flagyl and Cipro, but that none of it was working.  (Tr. 47.)  Plaintiff testified that he also had fistulas that were still draining for which he wore a pad.  (Tr. 46.)  He reported that his condition was getting worse and he had been having flare-ups.  (Tr. 47.)  During a flare-up, he would get chest pains, be "bent over in pain," and "in the bathroom constantly."  (Tr. 48.)  He reported that on a typical day, he spent three-quarters of the day lying down.  (Id.)  He was in the bathroom three or four times in the morning for 30-45 minutes at a time.  (Id.)  He had diarrhea once per day and blood in his stool two to three times per week.  (Tr. 48, 53.)  The ALJ noticed that Plaintiff was sitting on an angle, "kind of on [his] hip."  (Tr. 49.)  Plaintiff explained that because of the fistulas he could not sit straight with both feet flat on the floor for more than fifteen minutes due to pressure build up.  (Tr. 49.)  Plaintiff stated that he had pain every day in his chest, stomach, and "bottom area."  (Tr. 50-51.)  Plaintiff testified that he spent most of his time laying down or hanging out in his room.  He watches television and movies and plays video games.  (Tr. 54.)  He does not go out.  (Id.)  He hangs out with his friends in his room or on the deck outside.  (Tr. 55.)  He has trouble going up and down stairs and does not go downstairs in his house "much."  (Tr. 51.)  He estimated he could "sit [for] an hour tops."  (Tr. 56.)  He could stand for "two hours tops."  (Tr. 57.)  He was also unable to "walk far" because it was "uncomfortable."

(Tr. 57-58.)  He estimated he could lift 10-12 pounds and stated that bending also caused pain. (Tr. 58.)

**C. Medical Evidence**

    1. 2007 Through 2012

Plaintiff was diagnosed with Crohn's disease in 2007.  (Tr. 281.)   In February and July 2007, Plaintiff underwent procedures for drainage of perirectal abscesses.  (Id.)  In September 2008, Plaintiff was hospitalized for seven days for bloody diarrhea, pain, and drainage from perirectal lesions.  (Id.)  According to treatment notes from Richard Manners, M.D., Plaintiff underwent procedures for rectal abscesses in 2009 and 2010 and a "c-tong procedure" to drain an abscess in 2010.  (Tr. 329.)

Plaintiff was treated by Richard Scriven, M.D. for several years for Crohn's disease.  (Tr. 292.)  On June 2, 2010, Plaintiff saw Dr. Scriven who noted that Plaintiff's fistula was still draining and that he had been on Remicade for the past two years.  (Id.)  On September 20, 2010, Roberto Bergamaschi, M.D., performed surgery on Plaintiff to place two setons for drainage in the anal canal.  (Tr. 303-04.)  After the surgery, Plaintiff reported "decreasing pain" and there was no drainage or swelling.  (Tr. 314.)  On August 15, 2011, Plaintiff returned to Dr. Bergamaschi.  (Tr. 312.)  There was a small change in the skin near one of the setons, suggesting that Plaintiff's disease was possibly still active despite the treatment with Remicade.  (Tr. 312.)

From October 2011 through December 2012, Plaintiff remained stable with Remicade treatment.  (Tr. 327, 333, 345, 348.)  For example, on October 26, 2011, Plaintiff saw Dr. Manners. Plaintiff reported that he was "doing relatively well," denied abdominal pain, and stated that he was "very much into body building and [went] to the gym several times a week."  (Tr. 333.)   On July 26, 2012, Plaintiff again saw Dr. Manners who found that he was "stable on Remicade

therapy" given every 8 weeks.  (Tr. 332.)  On September 12, 2012, Plaintiff saw colorectal surgeon Paul E. Savoca, M.D.  (Tr. 327.)  Plaintiff's symptoms were "rapidly improving," and he was doing well.  (Id.)  In October 2012, Plaintiff's setons were removed.  In October and December 2012 Plaintiff tolerated his Remicade treatment well.  (Tr. 345, 348.)

    2. April 2013 Through March 2015

In April 2013, Plaintiff began to see an adult gastroenterologist, Bethany DeVito, M.D. (Tr. 386.)  On April 1, 2013, Dr. DeVito noted that Plaintiff's disease was "well-controlled" and recommended continuing the Remicade treatment.  (Tr. 387.)  An April 8, 2013 MRI of Plaintiff's abdomen indicated no evidence of acute or chronic inflammatory bowel disease.  (Tr. 373.)

On June 5, 2013, Plaintiff saw Dr. DeVito and reported nausea but no abdominal pain.  (Tr. 657.)  He had been drinking protein shakes after working out at the gym.  (Tr. 657.)  Plaintiff was still receiving Remicade infusions, but preferred the lower dose of five milligrams per kilo instead of his previous dosage of 10 milligrams per kilo.  (Id.)  DeVito agreed that he could continue on the lower dosage; and recommended that Plaintiff discontinue protein shakes, undergo an endoscopic ultrasound, and see a colorectal surgeon.  (Tr. 658.)

On October 31, 2013, state agency medical consultant, D. Dorff, M.D., reviewed the evidence of record and determined that Plaintiff's impairment did not meet the Listings, and that he retained the ability to lift/carry 10-20 pounds and stand/walk for six hours.  (Tr. 403.)

On December 4, 2013, Plaintiff saw Dr. DeVito again. (Tr. 661.) He denied nausea, abdominal pain, and vomiting.  (Id.)  Plaintiff had started receiving his Remicade treatment every 10 weeks instead of every 8 weeks.  (Id.)  Dr. DeVito was concerned that Plaintiff could be developing a flare up of his Crohn's disease due to more frequent bowel movements and perianal inflammation.  (Tr. 662.)  Dr. DeVito opined that the flare up could be the result of the decreased

6

dosage and frequency of Remicade.  (Id.)  Dr. DeVito noted that there was a question of why Plaintiff's enzyme levels remained elevated even though he was asymptomatic and whether the Remicade was causing it.  She recommended repeat testing of his pancreatic enzymes, and stated that if his enzyme levels remained normal after his next Remicade infusion, she would consider recommending Plaintiff go back to every 8 weeks for the Remicade treatment.  (Id.)

On January 30, 2014, Dr. Savoca completed a questionnaire concerning Plaintiff's functional abilities.  (Tr. 406-09.)  Dr. Savoca saw Plaintiff once on September 12, 2012 for treatment of his Crohn's disease.  (Tr. 406; see Tr. 327.)  While stating he was unable to provide an opinion as to Plaintiff's ability to do work-related activities, Dr. Savoca opined that Plaintiff had no limitations in his abilities to lift/carry, stand/walk, sit, or push/pull.  (Tr. 408-09.)

Throughout 2014 and 2015, Plaintiff continued to see Dr. DeVito every 2 or 3 months. (See Tr. 654, 659, 661, 663, 665, 667, 669, 671.)  On April 7, 2014, Dr. DeVito noted that Plaintiff appeared to be in remission.  (Tr. 663-64.)  On July 2, 2014, Plaintiff saw Dr. DeVito and reported no abdominal pain, nausea or vomiting.  (Tr. 665.)  He reported rectal irritation with clear drainage. (Id.)  Upon examination, he had skin tags, and no draining, masses, or tender fluctuation.  (Tr. 666.)  Dr. DeVito prescribed Cipro and Flagyl for a ten-day course and recommended that he see the colorectal surgeons as soon as possible.  (Id.)  On March 18, 2015, Plaintiff saw Dr. DeVito and reported a good appetite, weight gain, and one formed bowel movement per day without bleeding.  (Tr. 671.)  He stated that he had abdominal pain in January that resolved as soon as he received his Remicade infusion. (Id.)  At this time, he was undergoing a Remicade infusion every ten weeks and did not want to increase the frequency.  (Id.)  A physical examination revealed no abnormalities.  (Tr. 672.)

3. <u>May 2015 Through December 2016</u>

On May 18, 2015, Plaintiff saw Dr. DeVito and reported abdominal pain, diarrhea, and increased bowel movements, including 45 minutes in the bathroom at a time.  (Tr. 673.)  Plaintiff's mother stated that Plaintiff had not been truthful about his symptoms during his visit in March 2015.  (Tr. 673; <u>see</u> Tr. 671.)  Dr. DeVito noted that the return of Plaintiff's symptoms could be due to the reduction in the frequency of the Remicade treatment.  (Tr. 673-74.)  Plaintiff refused to change the frequency to every eight weeks.  (Tr. 673.)  There was a concern from Plaintiff that Remicade was giving him pancreatitis and could put him at risk for cancer.  (<u>Id.</u>)  Dr. DeVito recommended an MRI of the pancreas and repeat blood testing.  (Tr. 674.)  She also recommended that Plaintiff seek a second opinion at Mount Sinai.  (<u>Id.</u>)

A June 12, 2015 MRI of Plaintiff's abdomen and pelvis showed possible mural fibrosis; there was no evidence of pancreatitis or pancreatic ductal dilation.  (Tr. 737-38.)  A September 14, 2015 MRI of Plaintiff's abdomen and pelvis was unremarkable.  (Tr. 745.)

Plaintiff continued to complain of abdominal pain, nausea, and diarrhea through July 2016. (Tr. 675, 678-79, 683, 687.)

On July 27, 2016, Plaintiff went to the emergency room for chest pains.  (Tr. 690.) Plaintiff's mother reported to Dr. DeVito that the emergency room staff stated the chest pains could have resulted from long-term Remicade use.  (<u>Id.</u>)  Plaintiff's chest x-ray and blood work were normal.  (<u>Id.</u>)  Dr. DeVito doubted that Plaintiff's chest pains were due to his Remicade treatments and recommended a pulmonary consultation.  (<u>Id.</u>)

4. <u>December 2016 Through August 2017</u>

On December 7, 2016, Plaintiff agreed to increase the frequency of his Remicade treatment from every 10 weeks to every 8 weeks.  (Tr. 694.)  Following the increase in frequency, Plaintiff

reported an improvement in symptoms.  On February 8, 2017, Plaintiff saw Dr. DeVito and stated that he had abdominal pain "once in a while," no nausea, and no diarrhea and reported that he had been exercising.  (Tr. 697.)  On April 5, 2017, he reported abdominal pain that morning, followed by two to three soft bowel movements; he felt well for the most part.  (Tr. 699.)  He denied diarrhea or rectal bleeding.  (Id.)  He had been going to the gym and exercising.  (Id.)

At the hearing on July 31, 2017, the ALJ stated he was going to send Plaintiff for an examination with a consultative examiner.  (Tr. 61-62.)  On August 24, 2017, Andrea Pollack, D.O., conducted an internal medicine consultative evaluation.  (Tr. 790-93.)  Upon examination, Plaintiff's gait and stance were normal, he appeared to be in no acute distress, bowel sounds were normal, and there was abdominal and epigastric tenderness on moderate palpation. (Tr. 792.)  Dr. Pollack diagnosed Crohn's disease, anal Crohn's disease, colitis, pancreatitis, and lymphadenopathy.  (Tr. 793.)  Dr. Pollack opined that Plaintiff had a marked restriction in travel, mild restrictions in squatting, bending, lifting, and carrying, and a moderate restriction in sitting. (Id.)

## D. **The ALJ's Decision**

The ALJ issued his decision on November 17, 2017, applying the five-step process described below, pursuant to 20 C.F.R. § 404.1520.  (Tr. 15-25.)  At the outset, the ALJ determined that Plaintiff had not attained the age of 22 as of November 1, 2008, the alleged onset date.  (Tr. 17.)  At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of November 1, 2008.  (Tr. 18.)  At step two, the ALJ found that Plaintiff suffered from irritable bowel syndrome ("IBS"), which he noted was alternatively diagnosed in the record as irritable bowel disease, Crohn's disease, perianal disease, and colitis. (Id.)   At step three, ALJ Greenberg determined that Plaintiff's impairments, alone or in

combination do not meet or medically equal the severity of any of the regulation's listed impairments.  (Tr. 18-19.)  Specifically, ALJ Greenberg considered Listing 5.06, Inflammatory Bowel Disease.  (Id.)

ALJ Greenberg then addressed step four, first considering Plaintiff's RFC.  An RFC determination identifies what work a claimant can still perform, despite his limitations.  See 20 C.F.R. § 404.1545.  The ALJ determined that Plaintiff had the RFC to perform light work, except that Plaintiff "cannot work on ladders, ropes or scaffolds," "cannot operate motorize equipment as part of a job," and "must be able to sit for five minutes after standing for 25 minutes, or stand for five minutes after sitting for 25 minutes, but he can continue working in either position."  (Tr. 23.)

ALJ Greenberg concluded that the RFC was supported by "successful surgical intervention, prolonged periods of an asymptomatic disease that was in sustained remission for years, the claimant's flare-ups which correspond with his noncompliance with treatment recommendations, the claimant's return to stable levels following compliance with medical advice, and the claimant's range of activities of daily living such as weight-lifting and exercising."  (Tr. 23.)  In making this determination, the ALJ examined Plaintiff's testimony and the medical evidence in the record.  (Tr. 19-23.)  The ALJ found that Plaintiff's "statements about the intensity, persistence, and limiting effects of his symptoms" are "inconsistent with the medical evidence which does not document the same severity."  (Tr. 20.)  Specifically, the ALJ noted that: throughout 2011 and 2012, following Plaintiff's surgery in 2010, the treatment notes showed that Plaintiff was "stable" on Remicade therapy, his symptoms were "rapidly improving," and he had returned to physical activity and body building.  (Tr. 20-21.)  The ALJ considered Dr. DeVito's treatment notes from 2013-2014, which showed that Plaintiff continued to be generally asymptomatic.  (Tr. 21-22.)  The ALJ also noted that from 2015-2016, Plaintiff complained of

symptoms but refused to adjust the Remicade dosing, despite Dr. DeVito's recommendation, until December 2016, after which he reported to Dr. DeVito in April 2017, that he did not have frequent abdominal pain, did not have abnormal bowel movements, had returned to exercising, and for the most part felt well.  (Tr. 22.)  The ALJ considered that at the hearing in July 2017, Plaintiff described "very severe symptoms," "exhibited a pronounced lean to one side while seated," and alleged he was unable to lift anything or sit for prolonged periods.  (Tr. 22.)  The ALJ stated that as to Plaintiff's alleged physical impairment, he gave substantial weight to Dr. Pollack's examination, and noted that the "symptoms and manifestations described at the hearing (pronounced leaning, inability to sit, severe pain, difficulty breathing) do not appear to have been replicated at the consultative examination."  (Tr. 22.)

The ALJ concluded at step four that Plaintiff had no past relevant work experience.  (Tr. 23.)  The ALJ found that Plaintiff was 14 years old on the disability onset date and 23 years old at the date of the hearing, which is defined as a younger individual age (ages 18-49).  (Id.)  Finally, ALJ Greenberg relied on the testimony of the Vocational Expert ("VE") to determine at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (Tr. 23-24.)  The VE testified that there were light work, unskilled jobs that Plaintiff could perform including as a mail sorter (74,683 jobs in the national economy), a price marker (228,088 jobs in the national economy), and an office helper (121,957 jobs in the national economy).  (Tr. 23-24.)  The VE testified that, even if Plaintiff was limited to a sedentary level of work with the same sit-stand limitation, Plaintiff could perform the following jobs that are classified as sedentary, unskilled work including order clerk (20,103 jobs in the national economy), a callout operator (17,955 jobs in the national economy), and an inspector (26,522 jobs in the national economy).  (Id.)

Accordingly, the ALJ found that Plaintiff was not under a disability as defined in the Social Security Act from November 1, 2008 through the date of his decision.  (Tr. 24.)

## II. DISCUSSION

### A. Social Security Disability Standard

Under the Social Security Act, to be entitled to child disability benefits as a disabled adult, an individual must demonstrate that: he is the child of an insured person who has died, retired, or become disabled; he is or was dependent on the insured person; he is unmarried; and he was under a disability as defined in the Act, before he attained the age of 22, and that the disability has continued.  See 42 U.S.C. § 402(d)(1); 20 C.F.R. § 404.350(a).

Under the Social Security Act, "disability" is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is disabled when his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

The Commissioner's regulations set out a five-step sequential analysis by which an ALJ determines disability.  20 C.F.R. § 404.1520.  The analysis is summarized as follows:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008) (second alteration in original) (quoting Green–Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)).   As part of the fourth step, the Commissioner determines the claimant's RFC before deciding if the claimant can continue in his or her prior type of work.   20 C.F.R. § 404.1520(a)(4)(iv).   The claimant bears the burden at the first four steps; but at step five, the Commissioner must demonstrate "there is work in the national economy that the claimant can do."   Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009); see also Campbell v. Astrue, No. 12-CV-5051, 2015 WL 1650942, at *7 (E.D.N.Y. Apr. 13, 2015) (citing Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999)).

### B.  Scope of Review

When reviewing a final decision of the Commissioner, the district court "must determine whether the correct legal standards were applied and whether substantial evidence supports the decision."   Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), as amended on reh'g in part, 416 F.3d 101 (2d Cir. 2005).   "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the Court] will not substitute [its] judgment for that of the Commissioner."   Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

"Substantial evidence is more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks, citation, and brackets omitted).   In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."   Id.   However, the Court "defer[s] to the Commissioner's resolution of conflicting evidence."   Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir.

2012).  When substantial evidence in the record supports the Commissioner's findings as to any fact, those findings are conclusive and must be upheld.  42 U.S.C. § 405(g).

The Court can reject the factual findings of the Commissioner "only if a reasonable factfinder would <u>have to conclude otherwise</u>."  <u>Brault v. Soc. Sec. Admin., Comm'r</u>, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (citation and internal quotation marks omitted).  Because the agency, not the district court, should "weigh the conflicting evidence in the record," <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998), the Court may not substitute its own judgment for the ALJ's, even if the Court "might justifiably have reached a different result upon a <u>de novo</u> review."  <u>Jones v. Sullivan</u>, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation omitted).

When the Commissioner's factual findings are "supported by substantial evidence," the Court must defer to those findings unless "an error of law has been made that might have affected the disposition of the case."  <u>Pollard v. Halter</u>, 377 F.3d 183, 189 (2d Cir. 2004) (quoting <u>Townley v. Heckler</u>, 748 F.2d 109, 112 (2d Cir. 1984)) (citations omitted).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision."  <u>Ellington v. Astrue</u>, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing <u>Johnson v. Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987)).

If "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations," the district court should remand for further proceedings.  <u>Manago v. Barnhart</u>, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004).

## C.  <u>Analysis</u>

In support of his appeal of ALJ Greenberg's decision, Plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence because the ALJ did not properly consider the limiting effects of Plaintiff's irritable bowel disease, including that he needs to use the restroom

frequently and receives intravenous Remicade treatment for 3 hours every 6-8 weeks.  (ECF No. 18 at 13-17.)  For the reasons set forth below, this argument is unavailing.

**1.  The ALJ's RFC Finding is Supported by Substantial Evidence.**

a. <u>Restroom Usage</u>

First, Plaintiff argues that the RFC did not properly account for his need to frequently use the restroom for extended periods of time.  (ECF No. 18 at 14-15.)  Plaintiff does not cite to any medical opinion stating that he required a limitation for restroom breaks.  Rather, Plaintiff cites only to his own testimony at the July 31, 2017 hearing that he has flare-ups he is in the bathroom constantly for 30-45 minutes at a time.  (ECF No. 18 at 15; Tr. 48-49.)

The ALJ properly resolved the discrepancies between Plaintiff's testimony at the hearing and the other evidence in the record.  "It is the function of the Commissioner, not the reviewing court to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.  Thus, the ALJ, after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility may decide to discredit the claimant's subjective estimation of the degree of impairment."  <u>See</u> <u>Pietrosante v. Berryhill</u>, No. 18-CV-01346, 2020 WL 8361917, at *5 (E.D.N.Y. Nov. 13, 2020) (internal quotations and alterations omitted).  Here, the ALJ reasonably found that Plaintiff's testimony at the hearing was inconsistent with other evidence in the record— specifically, the treatment notes documenting his condition and treatment, Plaintiff's own statements in the treatment notes, and Dr. Pollack's examination.  The treatment notes indicated that: (1) Plaintiff's Crohn's disease was responsive to surgical intervention in 2012; (2) he generally remained asymptomatic until May 2015; (3) from May 2015 to December 2016, Plaintiff's condition became more symptomatic, but he refused to adjust his treatment; and (4) when Plaintiff consented to receive Remicade treatment every 8 weeks, the treatment notes

from the most recent visits (in February and April 2017) showed improvement including better bowel movements, weight gain, and increased physical activity.  Additionally, Plaintiff's own statements in the treatment notes indicate that he often denied symptoms including vomiting, diarrhea, pain, and bleeding, and Plaintiff's range of activities including exercising and weight-lifting.

Moreover, the ALJ was not required to credit Plaintiff's statements concerning his need for bathroom breaks as no medical opinion supported Plaintiff's testimony on this point.  See Bowen v. Comm'r of Soc. Sec., No. 19-CV-00420, 2020 WL 2839318, at *4-5 (W.D.N.Y. June 1, 2020) (denying plaintiff's motion to remand where plaintiff suffered from IBS and argued that the ALJ erred in not making specific findings regarding bathroom breaks, but "no physician [] opined that [p]laintiff requires any additional access to toilet facilities" and the "ALJ reasonably concluded that Plaintiff's allegations concerning the severity of his symptoms were not supported by evidence in the record"); Poupore v. Astrue, 566 F.3d 303, 307 (2d Cir. 2009) (finding plaintiff's subjective complaints were insufficient to establish a disability where they were unsupported by objective medical evidence).

Plaintiff notes that Dr. Pollack opined that Plaintiff had a moderate restriction in sitting and marked restriction in travel.  (ECF No. 18 at 15.)  Plaintiff argues that Dr. Pollack's finding of a marked restriction in travel was "likely because of his need to use the restroom frequently and for extended periods of time," but Dr. Pollack's report does not say that.  (Id.)  The ALJ gave Dr. Pollack's opinion substantial weight in determining Plaintiff's physical limitations, and included a limitation for sitting and standing.  However, Dr. Pollack's opinion says nothing about restroom breaks or a limitation based on restroom usage.

16

Ultimately it is Plaintiff's burden to prove that he should have a more restrictive RFC than the one assessed by the ALJ.  See Villalobo v. Saul, No. 19-CV-11560, 2021 WL 830034, at *16 (S.D.N.Y. Feb. 9, 2021) (citing Smith v. Berryhill, 740 F. App'x 721, 726 (2d Cir. 2018)).  Here, the ALJ reasonably concluded that Plaintiff failed to meet his burden by considering the Plaintiff's treatment history, the objective medical evidence, Plaintiff's own statements and testimony, and the opinion of a consultative examiner.[4]  Accordingly, this argument is unavailing.

   b. Remicade Treatment

Second, Plaintiff argues that the ALJ failed to consider that Plaintiff received Remicade treatment every six to eight weeks at home for three hours.  (ECF No. 18 at 15-16.)  Plaintiff contends that "[a] reasonable person would expect some limitations for being off-task or absent for an individual being treated with IV medication on a regular and continuing basis."  (ECF No. 18 at 15-16.)  Plaintiff cites to Social Security Ruling 96-8 which states that:  "[t]he RFC assessment must be based on all of the relevant evidence in the case record, such as . . . [t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)."  SSR 96-8.  The Commissioner responds that, there is no evidence that Plaintiff experienced any disabling side-effects from his medication, and that the Remicade treatment reports in the record from 2012 noted that Plaintiff tolerated his treatment well.  (ECF No. 20 at 16.)  In his reply brief, Plaintiff argues that the Commissioner misstated his argument and that he is not arguing about the side-effects of Remicade but, rather, is arguing that the ALJ failed to consider the mechanics of the

---

[4]  The record does not contain an opinion from Plaintiff's treating physician, Dr. DeVito, addressing any functional limitations, including bathroom issues.  The only opinion from one of Plaintiff's doctors is a January 30, 2014 questionnaire completed by Dr. Savoca, who only treated Plaintiff once.  Dr. Savoca opined that Plaintiff had no limitations in his abilities to lift/carry, stand/walk, sit, or push/pull.  Dr. Savoca did not mention any bathroom issues and was unable to provide an opinion as to Plaintiff's ability to do work-related activities.  Plaintiff, who was represented by counsel both below and on this appeal, has not argued that the ALJ violated his duty to develop the record.

treatment, "including the disruption that 3 hours of IV treatment necessarily has on his routine and would have on his ability to perform work on a sustained basis." (ECF No. 21 at 3.) The Court disagrees with Plaintiff.

First, the ALJ clearly considered the effect Plaintiff's Remicade treatment had on Plaintiff's symptoms and explicitly noted the frequency of these treatments.[5] (Tr. 21–22.) Second, there is no evidence in the record, from a medical provider or Plaintiff himself, indicating that the disruption caused by 3-hour long IV treatments—which Plaintiff received every 6-8 weeks at his home—would affect his ability to perform work on a sustained basis.

Given the absence of evidence on this point, the ALJ was certainly not required to include any restrictions stemming from the Remicade treatments in the RFC determination. To the extent that Plaintiff argues that the ALJ erred simply because he failed to make explicit findings on this issue, the Court disagrees. The record offers little, if any, reason to believe that such infrequent IV treatments—which were administered at Plaintiff's home—would affect Plaintiff's ability to work. "[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" Petrie v. Astrue, 412 F. App'x 401, 407 (2d Cir. 2011) (summary opinion) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam)).

---

[5] In Plaintiff's 2013 function report, in response to the question "[i]f you do not prepare your own food or meals, explain why not," Plaintiff answered: "usually in bed 1x6weeks Remicade infusion by nurse comes to house." (Tr. 194.) In his decision the ALJ noted that based on the 2013 function report, "claimant has been treated with Remicade infusions (administered by a nurse at his home) which require the claimant to remain in bed 1 day every 6 weeks." (Tr. 20.) By the time of the hearing, Plaintiff was receiving Remicade treatment once every eight weeks. (Tr. 45.) He does not argue that he was in bed for the whole day on the day of the Remicade treatments and specifically says he is not arguing about the side-effects of medication, but rather argues that there was a 3-hour disruption based on the length of the infusion treatments. (ECF No. 21 at 3.)

While "[a]bsenteeism due to frequency of treatment is a relevant factor where treatment is medically necessary and related to the conditions for which plaintiff claims disability," the record here does not indicate that Plaintiff's Remicade treatment for three hours once every 8 weeks would disrupt a full-time work schedule. See Lucas v. Comm'r of Soc. Sec., No. 19-CV-195, 2020 WL 5748098, at *3 (W.D.N.Y. Sept. 25, 2020) ("while plaintiff consistently received chiropractic treatments multiple times per week and received weekly massage during a portion of the relevant time period, the medical record documents that these treatments lasted 15 minutes and there was no evidence that such appointments could not be scheduled to accommodate a full-time work schedule"). Here, the ALJ considered Plaintiff's Remicade treatments in formulating the RFC. There was no testimony or medical opinions in the record indicating that Plaintiff's schedule would be disrupted by the Remicade treatments. That the ALJ did not find that the at-home Remicade treatment for 3 hours once every 8 weeks required an additional RFC limitation, is not cause for remand.

### c. The ALJ Cited Medical Evidence

Finally, Plaintiff argues, generally, that he "does not have the ability to sustain employment at any level and the ALJ failed to cite any valid medical evidence to suggest otherwise," and that the ALJ improperly substituted his own opinion for that of a physician. (ECF No. 18 at 16.) This argument is without merit. The ALJ explicitly relied on the treatment history and notes of Plaintiff's treating physicians including Dr. Scriven, Dr. Manners, and Dr. DeVito from 2010 through 2017, to conclude that:

> [o]verall, [Plaintiff's] Crohn's disease was responsive to surgical intervention in 2012, and generally remained asymptomatic until about May 2015. From May 2015 to about December 2016, the [Plaintiff's] condition became more symptomatic, but he resisted adjusting his Remicade dosing—even though the claimant commented he felt better after the treatments. When the claimant finally consented to infusions on an eight-week (as opposed to a 10-week) schedule, the treatment notes again

19

documented signs of improvement such as better bowel movements, appropriate weight gain, and increased physical activity.

(Tr. 22.)  In determining Plaintiff's physical limitations, the ALJ also relied on the examination and opinion of Dr. Pollack, who found that Plaintiff only had a marked restriction in travel, mild restrictions in squatting, bending, lifting, and carrying, and a moderate restriction in sitting.  (Tr. 793.)  The ALJ clearly relied on the medical opinions and treatment notes in the record and did not substitute his own opinion.  Accordingly, this argument is without merit.

### III.  CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's motion for judgment on the pleadings and **GRANTS** the Commissioner's cross-motion.  The Clerk of the Court is directed to enter judgment accordingly.

**SO ORDERED.**

Dated: March 31, 2021
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE